***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties hereto are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On 24 April 2000, an employer/employee relationship existed between plaintiff and defendant, Spruce Pine Community Hospital.
3. Defendant is a duly qualified self-insured, with Allied Claims Administration acting as the servicing agent for American Alternative Insurance Company.
4. An I.C. Form 22 has been received into evidence, reflecting an average weekly wage of $377.66.
5. Pursuant to a Pre-Trial Agreement of the parties, numerous stipulated medical records have been received into evidence, including records of Dr. Robert J. Obeid, Dr. Russell A. Flint, Asheville Orthopaedic Associates and Miller Orthopaedic Clinic.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was 44 years of age at the time of hearing before the Deputy Commissioner and is employed by Spruce Pine Community Hospital as a physical therapy technician. Plaintiff works under the direction of a supervising physical therapist or physical therapist assistant and carries out patient specific care plans, including wound care, exercises, orthopedic transfers, ultrasounds, massages, and other treatment modalities.
2. Plaintiff testified that she sustained an injury to her left knee while at work on 24 April 2000. She testified that she felt a tearing sensation and burning pain in her left knee while moving a portable whirlpool. Plaintiff had pre-existing problems in both knees. In her recorded statement Plaintiff stated "since I've torn it before I thought this might be, you know, what was happening . . ."
3. Plaintiff has a long-standing history of bilateral knee problems. On 3 July 1996, plaintiff underwent left knee surgery to repair a torn meniscus. Plaintiff had been experiencing left knee pain for more than one year prior to the 3 July 1996 surgery, which had become progressively worse. A short time before her July 1996 surgery, plaintiff experienced a significant worsening of her left knee condition when she twisted her knee while providing assistance to her mother.
4. Approximately five weeks following her July 1996 surgery, plaintiff again twisted her left knee and experienced a recurrence of her pre-operative complaints. Consequently, on 18 September 1996, plaintiff underwent a second left knee surgery to repair a torn left meniscus.
5. On or about 6 March 1998, plaintiff felt a pop in her right knee when she rose from a squatting position. She reported feeling the same or similar symptoms and complaints that she experienced on previous occasions with her left knee. Plaintiff suffered a torn meniscus injury to her right knee. On 18 April 1998, plaintiff underwent right knee surgery to repair the meniscus.
6. In addition to her prior meniscus tears, plaintiff has experienced long-standing, progressively worsening degenerative chondromalacia in both of her knees.
7. On 17 May 2000, plaintiff returned to Dr. Donald Mullis, the orthopedic surgeon who performed the last two of her three previous knee surgeries. Plaintiff informed Dr. Mullis that she felt a pop in her left knee on 24 April 2000, while moving a whirlpool tank at work. Subsequent diagnostic studies revealed a partial tear of the meniscus for which plaintiff underwent surgical repair by Dr. Loomis on 26 May 2000.
8. Dr. Loomis found that plaintiff's left knee chondromalacia had worsened since her September 1996 surgery.
9. Plaintiff's regular duties as a physical therapy technician include assisting patients needing whirlpool treatment. The portable whirlpool used for such treatment was stored in the corridor, but it was cleaned and filled in a closet located down the hall from the room where the treatment was administered. The whirlpool is rolled into the closet, filled with water, rolled out of the closet, down the hall and into the treatment room. Transporting the whirlpool filled with water from closet to treatment room involves at least two turns, one out of the closet to position the whirlpool for rolling down the hall and another to position the whirlpool for entry into the treatment room from the hallway. The whirlpool is a full body tank which weighs about 100 pounds empty. The tank is filled with 150 to 160 gallons of water. A full tank weighs over 1300 pounds. The whirlpool height was just below plaintiff's chest area. The doorway leading to the treatment room has a small threshold, over which the whirlpool has to be rolled on every occasion that it is taken into or out of the treatment room.
10. Plaintiff testified that while she was moving the whirlpool filled with water across the doorway threshold and into the treatment room on 24 April 2000, the water in the whirlpool shifted, she lost control and the tank came back on top of her causing injury to her left knee. Plaintiff did not mention anything about water shifting in the whirlpool during her recorded statement. Plaintiff also testified that the water shifting in the whirlpool was unusual, but offered no evidence to show how the water shifting on 24 April 2000 was any different than the water shifting that occurred on other occasions. Plaintiff also did not describe anything different about the manner and method she employed to move the whirlpool on this occasion, as opposed to previous occasions.
11. On 25 May 2000, plaintiff gave a recorded statement in which she stated that she injured her left knee while trying to push the whirlpool tank filled with water. In response to the question of whether or not anything unusual happened when she was moving the whirlpool that day, plaintiff responded, "No." To the question, "So it was the same as it had been when you worked with it [the whirlpool] before," plaintiff responded, "Yes." Plaintiff was moving the whirlpool from the closet to the treatment room in the same manner as she had done on numerous prior occasions. Plaintiff's version of the 24 April 2000 whirlpool incident in her recorded statement indicates that she experienced increased left knee pain about a month prior to 24 April 2000, while pushing the whirlpool tank. Her knee was being treated within her department. On 24 April 2000, plaintiff was wearing an ace bandage on her left knee.
12. Prior to 24 April 2000, plaintiff provided whirlpool treatment to patients on virtually a daily basis, requiring her to move the portable whirlpool to and from the treatment room and closet on one or more occasions per day. Gail Barksdale, a physical therapist assistant, testified that the water in the whirlpool sloshes when you move the whirlpool out of the closet, down the hall, and across a threshold into the room. When asked if the water sloshes every time you move the whirlpool, Ms. Barksdale responded, "Yes, to a degree."
13. Based upon plaintiff's recorded statement and the testimony of Gail Barksdale, the Full Commission finds that water shifting in the whirlpool when it is moved was not unusual or unexpected. Therefore, based upon the greater weight of the evidence, including all reasonable inferences to be drawn therefrom, the Full Commission finds that on 24 April 2000, plaintiff experienced increased left knee pain while engaged in her normal and customary work routine of moving a whirlpool filled with water from a closet to a treatment room.
14. Plaintiff did not offer any testimony regarding how the water shifting within the whirlpool caused injury to her knee. She did not describe the whirlpool hitting her, or that she twisted her knee, or that any other potential mechanism of injury occurred. Accordingly, plaintiff has failed to provide any evidence establishing a causal connection between the water shifting in the whirlpool tank and her knee condition.
15. There is no credible evidence that plaintiff sustained an injury by accident on 24 April 2000. Plaintiff's left knee chondromalacia and/or meniscus tear is not an occupational disease as plaintiff's knee problems did not result from causes and conditions characteristic of and peculiar to plaintiff's employment, nor has plaintiff established that her employment placed her at a greater risk of sustaining chondromalacia and/or a meniscus tear compared to the general public not so employed.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain a compensable injury by accident while at work on 24 April 2000. Plaintiff experienced increased left knee pain on 24 April 2000, while engaged in her normal routine in her usual and customary manner. Plaintiff's left knee injury was not caused by an accident. N.C. Gen. Stat. § 97-2. See Davis v. Raleigh RentalCenter, 58 N.C. App. 113, 292 S.E.2d 763 (1982); King v. Exxon Co.,46 N.C. App. 750, 266 S.E.2d 37 (1980); Porter v. Shelby Knit, Inc.,46 N.C. App. 22, 264 S.E.2d 360 (1980) (No matter how great the injury, if the employee is performing her regular duties in the usual and customary manner, and is injured, there is no "accident" and the injury is not compensable). Further, plaintiff has failed to establish a causal connection between her knee injury and her work activity. N.C. Gen. Stat. § 97-2.
2. Plaintiff has failed to establish that her left knee injury of 24 April 2000, constitutes an occupational disease. N.C. Gen. Stat. § 97-53
(13).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim must be and the same is hereby DENIED.
2. Each side shall bear its own costs.
This the ___ day of June, 2002.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN